2015 VT 88

**In re Zaremba Group Act 250 Permit**
**(Shawn Cunningham, Michele Bargfrede, Cindy Farnsworth, Richard Farnsworth, Gail Gibbons, Robert Gibbons, Diane Holme, John Holme, Janice Housten, Leonard Lisai, Scott Morgan, Donald Payne, Stephanie Payne, Kathy Pellett, William Reed, Kathy Schoendorf, Claudio Veliz, Bonnie Watters and Lew Watters, Appellants)**

[127 A.3d 93]

No. 14-162

Present: **Dooley, Skoglund, Robinson and Eaton, JJ., and Morris, Supr. J. (Ret.), Specially Assigned**

Opinion Filed June 26, 2015

*James A. Dumont* of *Law Office of James A. Dumont, P.C.*, Bristol, and *Charlotte B. Ancel* of *Sheehey Furlong & Behm PC*, Burlington, for Appellants.

*William H. Sorrell*, Attorney General, and *Justin Kolber*, Assistant Attorney General, Montpelier, for Appellees Agency of Natural Resources and Natural Resources Board.

*David R. Cooper* of *Kenlan, Schwiebert, Facey & Goss, P.C.*, and *Alan Biederman* of *Biederman Law Office*, Rutland, for Appellee Zaremba Group, LLC.

¶ 1. **Skoglund, J.** Neighbors of a plot of land in Chester appeal the Environmental Division's decision to grant an Act 250 permit amendment to appellee Zaremba Group to build a Dollar General store ("the Project") on that plot. We affirm.

¶ 2. The trial court found the following facts relevant to this appeal. Zaremba is the owner of the 10.08-acre plot of land in question. The proposed building site lies within the floodway of Lovers Lane Brook ("the Brook"). The Project would result in a loss of floodwater storage of 1,305 cubic yards, but is designed to include a flood-mitigation cut area, which would provide additional floodwater storage of 2,544 cubic yards. The Project would narrow the Brook floodway at two points, but both of these areas are at least as wide as the Brook's narrowest section, which is just south of the Project site. The Project includes a minimum fifty-foot buffer along the Brook.

¶ 3. The Project is located in Chester's Residential Commercial District. The area 0.6 miles to the northwest of the Project site is a historical, dense, and walkable village center, while a contem-

porary, less dense mixed-use area lies to the south of the site. Buildings directly around the Project site are mostly set back from roadways with individual driveways and parking lots. Several properties in the immediate area of the site have large parking lots in front of their respective buildings. Views looking out from the Project site include some dense vegetation, a diner, and a building containing a gas station, mini market, and liquor outlet. The Project's highest point is thirty-five feet, and its footprint dimensions are seventy-feet wide by 130-feet deep. Its overall size is bigger than neighboring buildings, but the surrounding area includes buildings larger than the Project, such as the American Legion, St. Joseph's Church, and a self-storage facility. These buildings vary in architectural styles, sizes, and ages, with different roof pitches, building materials, numbers of stories, colors, and numbers and sizes of windows.

¶ 4. Despite this diversity among nearby buildings, the Project is distinct in several respects. The Project is intended to appear similar to a backyard barn, but its warehouse-like features shine through. It has large faux windows on each side of the front entrance, while no other buildings in the area have faux windows. The front entrance is comprised of full-length glass doors, while the sides of the building have no windows. It has a cupola, as some other buildings in the area have, but its cupola is located off-center, toward the front of the building and closer to Route 103, unlike those of nearby buildings. Finally, the Project's building has a large, undifferentiated mass. The Project, and especially these features, will be visible to travelers on Route 103.

¶ 5. To subdivide the lot for the Project, Zaremba applied to the District #2 Environmental Commission for an amendment to the existing Act 250 permit on that property. The Commission gave neighbors — the appellants here — as well as the Agency of Natural Resources (ANR) and Natural Resources Board, interested-person status. The Commission ultimately granted the permit amendment. Neighbors appealed that decision to the Environmental Division, claiming the proposed construction failed to meet the following Act 250 Criteria: 1(D), "Floodways"; 5, "Traffic Safety and Congestion"; 8, "Aesthetics"; and 10, "Conformance with Local and Regional Plans." Following trial, the Environmental Division affirmed the Commission's grant of the permit. Neighbors now appeal that decision to this Court, claiming that the Environmental Division's findings as to Criteria 1(D), "Floodways" and 8, "Aesthetics" were clearly erroneous. We affirm.

¶ 6. Neighbors must overcome a deferential standard of review to prevail on appeal in this case. "We will defer to the [Environmental Division's] factual findings and uphold them unless, taking them in the light most favorable to the prevailing party, they are clearly erroneous." *In re Lathrop Ltd. P'ship I, II, III*, 2015 VT 49, ¶ 21, 199 Vt. 19, 121 A.3d 630 (quotation omitted). Its factual findings are clearly erroneous only if they are supported by no credible evidence that a reasonable person would rely upon to support the conclusions. *In re Eastview at Middlebury, Inc.*, 2009 VT 98, ¶ 10, 187 Vt. 208, 992 A.2d 1014; *In re Bennington School, Inc.*, 2004 VT 6, ¶ 11, 176 Vt. 584, 845 A.2d 332 (mem.). "Although we review the environmental [division]'s legal conclusions de novo, we will uphold those conclusions if they are reasonably supported by the findings." *Lathrop*, 2015 VT 49, ¶ 21 (quotation and citation omitted).

¶ 7. ▆ Criterion 1(D) requires the applicant to show, and the Environmental Division to find, the Project's impacts on floodways will not endanger the public. That provision addresses two distinct flooding hazards: (i) inundation flooding, resulting from diversion or restriction of floodwaters; and (ii) erosion hazards, caused by "significantly increas[ing] the peak discharge" of the waterway. See 10 V.S.A. § 6086(a)(1)(D)(ii). ANR also plays an important role in cases involving Criterion 1(D). ANR has authority, pursuant to Act 250, to determine whether a particular project will fall within a floodway. *In re Woodford Packers, Inc.*, 2003 VT 60, ¶ 13, 175 Vt. 579, 830 A.2d 100 (mem.) (interpreting 10 V.S.A. § 6001(6) and (7)). Moreover, at an Environmental-Division trial, ANR may, as intervenor, present evidence relevant to its expertise, which the Environmental Division may rely upon in deciding the case. See *id.* ¶ 17 (noting that while burden of proof remains on applicant, Environmental Division may rely on evidence presented by ANR); see also 10 V.S.A. § 8504(n) (allowing persons granted interested-party status by District Commission to intervene in appeals to Environmental Division).

¶ 8. ▆ At trial, two experts testified as to the Project's potential floodway impacts: one from ANR and one on behalf of Zaremba. Neighbors presented no evidence with respect to Criterion 1(D), so their arguments on appeal are limited to showing the inadequacy of ANR's and Zaremba's expert testimony. Neighbors do not challenge the Environmental Division's findings as to

inundation flooding,[*] but contest its determination as to erosion in two ways.

¶ 9. They first argue that the Environmental Division's finding that the two floodway constrictions caused by the Project would be wider than the narrowest existing constrictions is contradictory to the evidence and amounts to reversible error. Zaremba's expert — who presented the only evidence directly related to this finding — testified that the Project's narrowest constriction of the Brook floodway would be "no more narrow [than the current narrowest area]; it would be equal to or greater." The Environmental Division's finding that the constriction would be "wider" rather than "wider or as wide" is indeed erroneous, but harmless. Although Zaremba's expert testified that the velocity of flowing water generally increases at points of constriction, other things being equal, he also explained that it decreases proportionately wherever the waterway widens, as the Brook floodway does at various points upstream and downstream of the new constrictions. Thus, any increase in velocity would be limited in time and space to the two newly constricted areas. Even so, he explained that the additional flood storage created by excavation for the Project would generally cause lower maximum water velocity, as compared with current floodway conditions. The Environmental Division found the same.

¶ 10. ■ Velocity, moreover, is not the only factor that determines erosion. Both ANR's Technical Guidance document for Criterion 1(D), admitted into evidence in this case, and the expert testimony make clear that volume or height of floodwaters, tailwater, channel slope, sediment load, and channel-boundary resistance collectively determine erosion. Zaremba's expert testified, and the Environmental Division found, given the existing constrictions, the Project will not increase the volume of floodwaters. ANR's expert's testimony corroborated that of Zaremba's expert, as ANR's expert determined the Project's minimum fifty-foot buffer adequately addressed erosion hazards. The Environmental Division agreed. The testimony of both of the floodway

---

[*] In the Statement of Issues of their brief, neighbors purport to challenge the environmental court's findings with respect to Criterion 1(D)(i), but offer no arguments or authority to show that the Environmental Division's decision as to that specific provision should be overturned. We therefore will not consider the issue. See *Flex-A-Seal, Inc. v. Safford*, 2015 VT 40, ¶ 20, 198 Vt. 496, 117 A.3d 823 (Supreme Court will not consider issues not adequately briefed).

experts and related evidence thus support the conclusion that the Project would not significantly increase peak discharge, and would not endanger the public. The Environmental Division's misstatement concerning the width of constriction does not significantly factor into this conclusion.

¶ 11. ▮ Neighbors also claim the Environmental Division had insufficient evidence on which to base its finding that the Project would not harm the public because certain computer modeling, which was not performed, was necessary to assess whether the changed topography would cause increased velocity and an erosion hazard. This argument fails because an applicant's burden under Criterion 1(D) does not require computer-modeling evidence. Neighbors cite to no authority for this proposition, and it has no basis in the statutory language. The Environmental Division need only determine by credible evidence that the Project would not significantly increase peak discharge in such a way as to endanger the public. See 10 V.S.A. § 6086(a)(1)(D)(ii). As explained above, the Environmental Division did just that, so we affirm its findings and conclusions as to Criterion 1(D).

¶ 12. ▮ We next turn to neighbors' argument regarding Criterion 8, Aesthetics. The framework for the Environmental Division's analysis under Criterion 8 is known as the *Quechee* test. See *Lathrop*, 2015 VT 49, ¶ 74 (citing *In re Quechee Lakes Corp.*, Nos. 3W0411-EB, 3W0439-EB, slip op. at 19-20 (Vt. Envtl. Bd. Nov. 4, 1985), http://www.nrb.state.vt.us/lup/decisions/1985/3w0439-eb-fco.pdf). The *Quechee* test provides:

> [A] project violates Criterion 8 if: (1) the proposed project will have an adverse aesthetic impact and (2) that impact will be undue. An impact is undue if: (1) it violates a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area; (2) it offends the sensibilities of the average person; or (3) the applicant has failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings.

*Id.* (citations, quotations, and alterations omitted).

¶ 13. ▮ The Environmental Division concluded that the project would have an adverse aesthetic impact on the surrounding area,

but that the impact would not be undue. Neighbors challenge this latter conclusion, but based on only one of the three prongs of the undue-impact test — violation of "a clear, written community standard intended to preserve the aesthetics" of the area. Neighbors offer, as such a standard, a specific provision of the Chester Zoning Regulations. Our inquiry regarding aesthetic impacts is thus limited to whether the court clearly erred in analyzing that zoning provision. If that provision constitutes "a clear, written community standard intended to preserve the aesthetics" of the area, and if the Project would violate it, the project's impact would be undue and it could not go forward. *In re Times & Seasons, LLC*, 2008 VT 7, ¶ 8, 183 Vt. 336, 950 A.2d 1189.

¶ 14. ■ The statement at issue is a criterion that the town's development review board "should . . . consider[ ]" in reviewing applications for conditional-use permits: that "all construction of new buildings . . . adhere harmoniously to the over-all New England architectural appearance which gives the center of Chester its distinct regional character and appeal." Town of Chester Zoning Regulations § 9.4(c)(4). The trial court did not determine whether this language. provides a clear standard intended to preserve aesthetics because the court concluded that, even if it does, the Project would not violate it. We hold that the provision does not qualify as such a standard, so our inquiry stops there.

¶ 15. ■ ■ Assuming without deciding that such a discretionary factor could be a clear standard intended to *preserve* aesthetics, it must contemplate the actual aesthetics of the area, rather than some idealistic portrait. See *In re Times & Seasons, LLC*, 2008 VT 7, ¶ 8 (explaining that community standard must be intended to *preserve* aesthetics of area). The criterion refers to the "center of Chester" — a vague description that we will assume means the historic village center — but the Project is not located in the pedestrian-oriented village center; it is more than a half-mile away in a vehicle-oriented part of the town. We need not decide whether the reference to "over-all New England architectural appearance" in this provision would provide clear guidance if this project were in the historic village center. The Project's immediate surroundings — including a flat-roofed structure containing a gas station, mini market, and liquor store — and the entirety of diverse architecture in the area cannot be said to conform to a discernible "New England architectural appearance." These con-

flicting architectural styles are evidence that the zoning criterion is not a clear community standard intended to preserve aesthetics, at least as applied to the area surrounding the Project. See *In re Woodstock Cmty. Trust & Hous. Vt. PRD*, 2012 VT 87, ¶ 33 n.8, 192 Vt. 474, 60 A.3d 686.

¶ 16. Because we reject neighbors' challenges based on Criteria 1(D) and 8, we affirm the Environmental Division's grant of an Act 250 permit amendment to Zaremba.

*Affirmed.*