NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 39

No. 2017-133

In re Korrow Real Estate, LLC            Supreme Court
Act 250 Permit Amendment Application

(State of Vermont, Appellant)           On Appeal from
                                         Superior Court,
                                         Environmental Division

                                         November Term, 2017

Thomas S. Durkin, J.

Thomas J. Donovan, Jr., Attorney General, and Kyle H. Landis-Marinello, Assistant
  Attorney General, Montpelier, for Appellant.

L. Brooke Dingledine of Valsangiacomo, Detora & McQuesten, P.C., Barre, and
  David L. Grayck of Law Office of David L. Grayck, Montpelier, for Appellee.

PRESENT: Reiber, C.J., Robinson, Eaton and Carroll, JJ., and Wesley, Supr. J. (Ret.),
                Specially Assigned

¶ 1. **EATON, J.** The District 5 Commission denied Korrow Real Estate LLC's as-built application for an Act 250 permit to construct a barn on property alongside the Dog and Stony Brook Rivers, finding the project failed to comply with Act 250 Criteria 1(D) and 1(F). In doing so, the Commission construed key terms as defined by the Agency of Natural Resources (ANR). On appeal, the Environmental Division reversed the decision and remanded the matter to the Commission with instructions to grant an as-built permit for the project. The Vermont Natural Resources Board now appeals the court's decision, asserting that the court failed to accord proper

deference to the ANR's statutory authority and expertise, and that the project fails to comply with the necessary Act 250 permitting criteria. We affirm in part, and reverse and remand in part.

## I. Facts and Procedural History

¶ 2.    By way of background, appellee, Korrow Real Estate LLC (Korrow), owns properties off Vermont Route 12A in the Town of Northfield, on either side of Stony Brook Road. On the northerly side of Stony Brook Road is an improved parcel of land that hosts offices for Gillespie Fuels and Propane, a business related to Korrow. In 2011, Korrow began constructing a large barn on a parcel of land on the southerly side of Stony Brook Road. Korrow intended to use the barn to house Gillespie propane trucks. As built, the barn is roughly 8000 square feet, and sits at the confluence of the Dog River and the Stony Brook River. After the project was complete in the summer of 2012, Korrow brought dry pack onto the property to level the parking area inside the barn. Korrow also brought a small amount of earthen fill to level areas outside the barn. Portions of this fill were placed in proximity to the nearby rivers. Prior to building the barn and bringing in the fill, Korrow sought and received a municipal zoning permit. However, Korrow constructed these improvements without first obtaining an Act 250 permit, which is required for development of this kind. It was not asserted this omission was intentional.

¶ 3.    In 1970, the Vermont Legislature passed Act 250 to protect and conserve Vermont's lands and environment, and to ensure that land use would not be detrimental to the public welfare and interests. 1969, No. 250, § 1 (Adj. Sess.); see generally 10 V.S.A. §§ 6001-6111. Act 250 requires a land-use permit before certain development can occur. 10 V.S.A. § 6081(a) ("No person shall . . . commence development without a permit."). "Development" means, in relevant part, "[t]he construction of improvements for commercial or industrial purposes on more than one acre of land within a municipality that has not adopted permanent zoning and subdivision bylaws." Id. § 6001(3)(A)(ii). Korrow's project is a "development" subject to Act 250 because it is a commercial project constructed on a 6.5-acre parcel in a municipality that has

2

not adopted permanent zoning and subdivision bylaws. As such, the Korrow project requires an Act 250 permit to remain as built on the property site.

¶ 4. When Act 250 applies to development, a permit can only issue if the project complies with all ten Act 250 criteria. Id. § 6086(a)(1) (outlining conditions and criteria necessary for project development). These criteria specifically address development on or near waterways and rivers. Id. On appeal, the parties dispute whether the Korrow project complies with Act 250 Criterion 1(D), pertaining to development within the "floodway" and "floodway fringe" of nearby waters, and Criterion 1(F), pertaining to development on "shorelines." Id. § 6086(a)(1)(D), (F). These provisions of Act 250 aim to protect Vermonters from the hazards of flooding and erosion, and to preserve the scenic and recreational features of rivers and their shorelines. Id. An applicant for an Act 250 permit, such as Korrow, bears the burden of proving compliance with both Criterion 1(D) and Criterion 1(F). Id. § 6088(a).

¶ 5. To determine project compliance with Criterion 1(D), the threshold question is whether the project is in the "floodway" or "floodway fringe" of a nearby waterway; if it is, then the applicant must prove that the project will not "restrict or divert the flow of flood waters," and "significantly increase the peak discharge of the river," and "endanger the health, safety and welfare of the public or of riparian owners during flooding." Id. § 6086(a)(1)(D)(i), (ii).

¶ 6. Similarly, Criterion 1(F) requires a threshold determination as to whether the project is located on a "shoreline." Id. § 6086(a)(1)(F). If so, shoreline development "must of necessity be located on a shoreline" and must be conducted in a manner that "will, insofar as possible and reasonable": (1) retain shorelines and waters "in their natural condition"; (2) allow continued and recreational access to the waters; (3) provide screening between the development and the river; and (4) "stabilize the bank from erosion, as necessary, with vegetation cover." Id. § 6086(a)(1)(F)(i)-(iv).

3

¶ 7.   Act 250 provides definitions for the terms "floodway, "floodway fringe," and "shoreline":

> (6) "Floodway" means the channel of a watercourse which is expected to flood on an average of at least once every 100 years and the adjacent land areas which are required to carry and discharge the flood of the watercourse, <u>as determined by the Secretary of Natural Resources</u> with full consideration given to upstream impoundments and flood control projects.
>
> (7) "Floodway fringe" means an area which is outside a floodway and is flooded with an average frequency of once or more in each 100 years <u>as determined by the Secretary of Natural Resources</u> with full consideration given to upstream impoundments and flood control projects.
>
>  . . . .
>
> (17) "Shoreline" means the land adjacent to the waters of lakes, ponds, reservoirs, and rivers. Shorelines shall include the land between the mean high water mark and the mean low water mark of such surface waters.

10 V.S.A. § 6001(6), (7), (17) (emphases added).  These provisions expressly grant the ANR authority to define the scope of the "floodway" and "floodway fringe."  <u>Id</u>. § 6001(6), (7).  If the ANR determines that a project falls within the "floodway" or "floodway fringe," then the project must also comply with additional Criterion 1(D) specifications to receive permit approval.  10 V.S.A. § 6086(a)(1)(D)(i)-(ii) (requiring project will not "restrict or divert the flow of flood waters," and "significantly increase the peak discharge of the river," and "endanger the health, safety and welfare of the public or of riparian owners during flooding").

¶ 8.   The Natural Resources Board (NRB) has statutory authority to adopt rules pertaining to Act 250 permit applications.  10 V.S.A. § 6025(b) ("The Board may adopt substantive rules . . . that establish criteria under which applications for permits under this chapter may be classified in terms of complexity and significance of impact under the standards of subsection 6086(a) of this chapter.").  The NRB has adopted such a rule defining "shoreline" for the purpose of determining compliance with Criterion 1(F).   Act 250 Rules, Rule 2(C)(20),

4

http://nrb.vermont.gov/sites/nrb/files/documents/2015%20Adopted%20Rules.pdf [https://perma.cc/4G79-LLZY] [hereinafter NRB Rule]. NRB Rule 2(C)(20) defines "shoreline" as follows:

> For purposes of 10 V.S.A. § 6086(a)(1)(F), a project involves the "<u>development or subdivision of shorelines</u>," if:
>
> (a) the project involves construction on or the use of "the land between the mean high water mark and the mean low water mark of such surface waters." 10 V.S.A. § 6001(17), or
>
> (b) the project, or an element of the project which is adjacent to the shoreline, has the potential for significant impact on any of the sub criteria specified in 10 V.S.A. § 6086(a)(1)(F)(i)-(iv).

¶ 9. With these definitions in mind, we return to Korrow's application to the District Commission for an as-built Act 250 permit. Applications for an Act 250 permit are filed with the District Commission to determine compliance with Act 250 criteria, including Criterion 1(D) and Criterion 1(F) discussed above. 10 V.S.A. § 6083(a) ("An application for a permit shall be filed with the District Commission as prescribed by the rules of the [Natural Resources] Board . . . ."). In the application at issue, Korrow indicated the project involved "development or subdivision on or near a river, lake, pond or reservoir shoreline." The Commission heard testimony from an ANR expert regarding the project's potential impacts on the Dog and Stony Brook Rivers, and evaluated the project's compliance with Act 250 Criteria 1(D) and 1(F).

¶ 10. Regarding Criterion 1(D), the ANR calculated the scope of the "floodway" and "floodway fringe" and determined that the Korrow project fell within the Act 250 "floodway." To calculate the scope of the "floodway," the ANR adhered to its "Technical Guidance for Determining Floodway Limits Pursuant to Act 250 Criterion 1(D)." Agency of Nat. Res., Technical Guidance for Determining Floodway Limits Pursuant to Act 250 Criterion 1(D) (October 9, 2009), http://www.docket7970.com/ANR/Attachment%20A.ANR.VGS.RTP.1-3%20(Nelson)/VT%20Technical%20Guidance%20for%20Determining%20Floodway%20Limits%20Pursuant%20to%20Act%20250%20Criterion%201(D).pdf [https://perma.cc/3YXE-

5

NQAL]. These guidelines, originally issued in 2003, were updated in 2009 to "enhance understanding of the ANR Floodway Procedure" and ensure "clear, consistent, and broadly accepted [ANR] floodway determinations." Id. at 1. The document is public and provides general background on how the ANR determines the "floodway" and "floodway fringe" when considering Criterion 1(D). The guidelines recognize the role of erosion hazards in defining the Act 250 "floodway," and require the ANR to "consider both inundation and fluvial erosion hazards . . . in the Act 250 regulatory process." Id. The ANR has stated that the guidelines' procedure for determining the Act 250 "floodway" surrounding an area "strikes an acceptable balance between having a consistent set of guidelines to reduce inundation and erosion hazards while allowing consideration of existing and future development . . . [and] remaining consistent with the science-based stream equilibrium objective." Id. at 2.

¶ 11.   The guidelines state:

> For the purpose of determining the inundation floodway under 10 V.S.A. § 6001(6), and the impacts of a project built in a floodway under Criterion 1(D), Agency technical staff will consider the regulatory floodway as defined by the Federal Emergency Management Agency (FEMA) and [the National Flood Insurance Program (NFIP)] regulatory standards.

Id. at 4. The guidelines clarify that the ANR may separately assess the geomorphology and erosion hazards of a project site to determine the "fluvial erosion hazard" (FEH) area. The ANR may also conclude that the FEH area applies "to lands that lie outside" the NFIP and FEMA designations. Id. at 3-4. Since publishing the updated guidelines in 2009, the ANR has also issued a "River Corridor Protection Guide," which provides a more detailed description of the methodology and data used to create the ANR FEH area. Both of these guidelines are instructive in understanding how the ANR calculates the FEH area for a project. Notably, the FEH area can be within, or less wide, than the inundation area mapped by the NFIP or FEMA, or it can be broader. "Upon comparison" of these measurements—the ANR's assessment of the FEH area and the NFIP/FEMA

6

designated area—"the Act 250 floodway limit shall be whichever laterally extends further from the stream." Id. at 4. Thus, the guidelines permit the ANR to expand the scope of the Act 250 "floodway" to align with the FEH area—even if the FEH area is broader than the NFIP or FEMA measurements.

¶ 12. Pursuant to these guidelines, the ANR construes the Act 250 "floodway" as encompassing the agency's assessment of the FEH area, the NFIP-mapped areas, and FEMA-designated portions of the Special Flood Hazard Area.

¶ 13. This construction by the ANR was critical to evaluating whether the Korrow project was within the Act 250 "floodway." Here, the ANR determined that "[m]uch of the existing barn, fill, and proposed drainage . . . are located within the Act 250 Floodway" because these portions of the project were constructed within the ANR's FEH area. The ANR determined the project was within the FEH area based on a geomorphic assessment of the project area, the project's proximity to the Dog and Stony Brook Rivers, and the potential for physical adjustments in the area. As noted above, the guidelines allow the Act 250 "floodway" to expand to match the ANR's definition of the FEH area. Therefore, although the barn was located outside the NFIP-mapped area and the FEMA-designated area, the Korrow project was within the ANR's FEH area, and thereby within the Act 250 "floodway." Id. § 6001(6). After making the preliminary finding that the project was within the "floodway," the Commission assessed project compliance with § 6086(a)(1)(D)(i)-(ii), and determined the project could not meet the Criterion 1(D) requirements as built. The Commission ordered that the project be removed and relocated to comply with Criterion 1(D).

¶ 14. The Commission reached a similar conclusion regarding Criterion 1(F). Based on recommendations from the ANR and the Department of Fish and Wildlife regarding the preservation of riparian buffers—naturally vegetated areas bordering waterways—along the Dog River and Stony Brook River, the Commission found the Project was located on a "shoreline," id.

7

§ 6001(17), and required that the project be removed and relocated to comply with Criterion 1(F). Id. § 6086(a)(1)(F). Korrow appealed the Commission's order to the Environmental Division.

¶ 15. While recognizing the deferential standard generally applied to agency interpretations of statutory provisions within their area of expertise, the Environmental Division found the ANR's construction of the "floodway" to be unreasonable in light of the project location and testimony presented at the evidentiary hearing. The court determined the project was not within a "floodway." Despite this determination, the court made additional findings that the project would not cause the adverse impacts for development within a floodway prohibited by Criterion 1(D) even if the project was within the floodway. The court also found that the project was not constructed on a "shoreline" and complied with the criteria listed in 10 V.S.A. § 6086(a)(1)(F)(i)-(iv). Ultimately, the court found that the project complied with Criteria 1(D) and 1(F), reversed the Commission's determinations, and remanded the proceedings to the Commission to issue Korrow's as-built Act 250 permit. This appeal followed.

¶ 16. On appeal, we address two issues: (1) whether the Korrow project complies with Act 250 Criterion 1(D), pertaining to the project's impact on the "floodway" and the "floodway fringe"; and (2) whether the project complies with Criterion 1(F), pertaining to development on a "shoreline." 10 V.S.A. § 6086(a)(1)(D), (F). The parties dispute whether the ANR appropriately calculated the scope of the "floodway" and "floodway fringe"; to what extent the court should defer to the ANR's definition of these terms; and whether the project was constructed on a shoreline and, if so, whether the construction "of necessity" occurred on the shoreline. We consider project compliance with Criteria 1(D) and 1(F) below.

II. Standard of Review

¶ 17. We review the court's factual findings for clear error and its findings of law de novo. In re Vill. Assocs. Act 250 Land Use Permit, 2010 VT 42A, ¶ 7, 188 Vt. 113, 998 A.2d 712 ("Under our standard of review, the Environmental Court determines the credibility of witnesses

8

and weighs the persuasive effect of evidence, and we will not overturn its factual findings unless, taking them in the light most favorable to the prevailing party, they are clearly erroneous. We review issues of law or statutory interpretation de novo." (quotations and citations omitted)). We will determine that a court's factual findings are clearly erroneous in limited circumstances—"only if they are supported by no credible evidence that a reasonable person would rely upon to support the conclusions." In re Zaremba Gr. Act 250 Permit, 2015 VT 88, ¶ 6, 199 Vt. 538, 127 A.3d 93. In contrast, the court's legal conclusions will be upheld "if they are reasonably supported by the findings." Id. (quotation omitted).

¶ 18.    Thus, we review the court's findings of fact—whether the project was within a "floodway" and/or on a "shoreline"—for clear error, and its legal conclusions—whether the project complied with Criteria 1(D) and 1(F) in light of its placement—de novo.

### III. Project's Compliance with Criterion 1(D)

¶ 19.    Act 250 Criterion 1(D) requires applicants who are proposing project development within the "floodway" or the "floodway fringe" of a body of water to demonstrate compliance with certain requirements. See 10 V.S.A. § 6086(a)(1)(D)(i) (explaining that applicant must show development within floodway "will not restrict or divert the flow of flood waters, and endanger the health, safety and welfare of the public or of riparian owners during flooding"); id. § 6086(a)(1)(D)(ii) (explaining that applicant must demonstrate development within floodway fringe "will not significantly increase the peak discharge of the river or stream within or downstream from the area of development and endanger the health, safety, or welfare of the public or riparian owners during flooding"). Determining whether a project triggers analysis under Criterion 1(D) requires a preliminary finding that the project is located within a "floodway" or "floodway fringe." Id. § 6001(6), (7). Notably, the ANR has specific statutory authority to determine the area comprising a "floodway" or "floodway fringe" pursuant to 10 V.S.A. § 6001(6) and (7), and thus whether a project falls within those areas. See Zaremba Gr. Act 250 Permit, 2015

9

VT 88, ¶ 7 ("ANR has authority, pursuant to Act 250, to determine whether a particular project will fall within a floodway. Moreover, at an Environmental Division trial, ANR may, as intervenor, present evidence relevant to its expertise, which the Environmental Division may rely upon in deciding the case." (citation omitted)). Here, the parties dispute whether the Korrow project was within the "floodway" or "floodway fringe," and whether the Environmental Division accorded the ANR proper deference in interpreting these terms.

¶ 20. Even when conducting an evidentiary hearing, the court owes deference to agency interpretations of policy or terms when: (1) that agency is statutorily authorized to provide such guidance; (2) complex methodologies are applied; or (3) such decisions are within the agency's "area of expertise." See Plum Creek Me. Timberlands, LLC v. Vt. Dept. of Forests, Parks & Rec., 2016 VT 103, ¶ 25, 203 Vt. 197, 155 A.3d 694 (explaining agency determinations regarding "the proper interpretation of policy or methodology within the agency's expertise are entitled to deference, even where there is a de novo hearing within the superior court"); In re Woodford Packers, Inc., 2003 VT 60, ¶ 12, 175 Vt. 579, 830 A.2d 100 (mem.) (deferring to agency interpretation of "floodway" and "floodway fringe" in Act 250 permit proceeding because ANR had authority to define terms based on plain language of statute).

¶ 21. While "[d]ecisions made within the expertise of such agencies are presumed correct, valid, and reasonable," the deference owed to agency determinations is not absolute. Plum Creek Me. Timberlands, LLC, 2016 VT 103, ¶ 31. An agency's authority to define terms within its statutory purview will be given deference unless that authority is applied "arbitrarily and capriciously" such that it "give[s] rise to a violation of due process." Woodford Packers, Inc., 2003 VT 60, ¶ 17. Agency determinations regarding complex methodologies are similarly entitled to deference by the court, unless the opposing party can demonstrate the agency decision was "wholly irrational and unreasonable in relation to its intended purpose." Plum Creek Me. Timberlands, LLC, 2016 VT 103, ¶ 28 (quotation omitted).

10

¶ 22.    Here, the ANR had broad statutory authority and the relevant expertise to define the "floodway" and "floodway fringe" surrounding the Dog and Stony Brooks Rivers, and the ANR applied complex methodologies to define the scope of these areas.  For these reasons, the court owed deference to the ANR's definitions of these terms.  First, "[t]he plain language of the statute states that the Secretary of ANR is authorized to make determinations as to what constitutes a floodway or a floodway fringe."  Woodford Packers, Inc., 2003 VT 60, ¶ 12; 10 V.S.A. § 6001(6), (7).  This statutory grant of authority alone signals that the court owed deference to the ANR interpretations of these terms under our caslaw.  Second, calculating the scope of these areas requires the application of complex methodologies within the ANR's area of expertise, as demonstrated by the Technical Guidance document and River Corridor Protection Guide, to which the court also owed deference.  See Plum Creek Me. Timberlands, LLC, 2016 VT 103, ¶¶ 29-30 (explaining that, even in context of de novo hearing, "deference is due [when] the methodology for determining compliance is an area over which [the agency] has broad statutory authority and the relevant expertise").  Therefore, the Environmental Division owed deference to the ANR's interpretation of the terms "floodway" and "floodway fringe" in conducting its evidentiary hearing unless the ANR's construction of these terms was "arbitrarily and capriciously applied" such that it "[gave] rise to a violation of due process."  Woodford Packers, Inc., 2003 VT 60, ¶ 17.  A mere disagreement with the ANR's interpretation of those terms is insufficient to allow the Environmental Division to substitute its own interpretation, especially in light of the broad statutory authority given to the ANR in applying those terms.  Plum Creek Me. Timberlands, LLC, 2016 VT 103, ¶ 30.

¶ 23.    In this case, the ANR determined the Korrow project was within the Act 250 "floodway" based on the project's location relative to the FEH area surrounding the Dog and Stony

Brook Rivers.[1] This ANR determination was based on established practice derived from the agency's Technical Guidance document, which requires the ANR to conduct complex calculations regarding the likelihood of flooding and erosion near the rivers at issue and the project site, and the project's potential impact on the area. The ANR presented detailed maps, exhibits, and expert testimony to explain its methodology and outcomes. On appeal, the trial court found the ANR's interpretation of the "floodway" to be unreasonable because it disagreed with the ANR's methods for calculating the FEH area. Applying its own methodology, the court construed the term "floodway" to encompass a smaller area, which did not include the Korrow project. Because the court determined the project was not within a "floodway," the court did not deem it necessary to evaluate the project's compliance with Act 250 Criterion 1(D).

¶ 24. The Environmental Division erred when it determined that the methodology applied by Korrow's expert, or the methodology of the court, was superior to that employed by the ANR. Plum Creek Me. Timberlands, LLC, 2016 VT 103, ¶ 30. "We have cautioned that courts are not a higher environmental agency entrusted with the power to make environmental law and policy, but rather exercise a narrow role in ensuring that the decisions of ANR are made in accordance with law." Id. (quotations omitted). Where "questions about complicated methodologies within the agency's expertise" arise, "a reviewing court, even in the context of a de novo hearing, must give deference to the agency's decision." Id. (quotation omitted).

¶ 25. Here, the Legislature granted the ANR express authority to construe "floodway" under the relevant Act 250 provisions, this task is within the ANR's area of expertise, and the ANR measured the project's compliance with Criterion 1(D) using complicated methodologies for determining the "floodway" that are established practice within the agency. Absent a violation of due process or evidence that the agency decision was arbitrary and capricious, the court should

---

[1] See, supra, ¶¶ 12-14.

have deferred to the agency's interpretation of the terms at issue and applied them when assessing the project. There is no such violation or evidence here.[2] The court's failure to afford deference to the ANR's interpretation of terms that the Legislature expressly placed within the agency's statutory purview, were within the ANR's area of expertise, and required complex methodologies to discern, was error. Accordingly, we apply the ANR definitions of "floodway" and "floodway fringe" on appeal.

¶ 26. In applying the ANR definition, we find that Korrow's project was within the "floodway" under 10 V.S.A. § 6001(6)—triggering analysis of project compliance with Act 250 Criterion 1(D).[3] 10 V.S.A. § 6086(a)(1)(D). Criterion 1(D)(i) specifies: "A permit will be granted whenever it is demonstrated by the applicant that . . . development . . . within a floodway will not restrict or divert the flow of flood waters, and endanger the health, safety and welfare of the public

---

[2] The Environmental Division determined that the ANR definition of "floodway" was unreasonable because the ANR's calculation of the FEH area and stream sensitivity assessment did not comport with the court's view of the "natural lay" of the land adjacent to the Dog and Stony Brook Rivers. The court used this rationale to delve into lengthy analysis under Chevron. Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 37 (1984). The fact that the court disagreed with the ANR's assessment is insufficient to demonstrate the ANR's methodology was unreasonable. In Woodford Packers, we explained that the ANR has the authority to define the "floodway" and "floodway fringe" for the purpose of Act 250 Criterion 1(D), even when the ANR alters its methodology for doing so. Woodford Packers, Inc., 2003 VT 60, ¶¶ 12-14 ("An agency is not required to adopt rules or regulations to carry out what its authorizing statute specifically directs it to do. While ANR's alteration of its methodology for determining floodways may have been a surprise to WPI—apparently the first applicant to undergo 'fluvial geomorphology' analysis—we cannot conclude that it lacked authority to do so." (citation omitted)). The court noted that, while "[s]tandardless alteration of ANR's practice of determining floodways may give rise to a violation of due process if arbitrarily and capriciously applied," reliance on ANR methodology is appropriate when such methods are "soundly grounded and supported by the evidence." Id. ¶ 17. Here, the ANR's methodology for calculating the FEH area was an established practice—it was not arbitrarily or capriciously applied to the Korrow project. Moreover, the ANR provided ample support, including testimony, maps, and exhibits, to support its interpretation of the Act 250 "floodway." The ANR was well within its statutory bounds when calculating the "floodway" here, and its authority should not have been usurped by the court.

[3] Because the project is within the "floodway" under § 6001(6), it is not necessary to address whether it is also within the broader scope of the "floodway fringe" under § 6001(7) or analyze its compliance with § 6086(a)(1)(D)(ii), regarding development within the floodway fringe.

or of riparian owners during flooding." Id. § 6086(a)(1)(D)(i). Here, the court made findings of fact sufficient to support its conclusion that the project's construction within the floodway would not "restrict or divert the flow of flood water" or "endanger the health, safety and welfare of the public or riparian owners during flooding."

¶ 27. The court does not owe deference to the Commission regarding its findings of fact when conducting its own evidentiary hearing, and we will defer to the trial court's findings of fact unless they are clearly erroneous. Zaremba Gr. Act 250 Permit, 2015 VT 88, ¶ 6.

¶ 28. Even though the court erroneously found that the project was located outside the "floodway," there was sufficient evidence to support the trial court's conclusion that the project complied with Criterion 1(D). The court based this conclusion on "undisputed evidence at trial," which was put into context for the court by a site visit conducted prior to trial, that the Korrow project was on "a significant upward slope" and therefore would not restrict or divert floodwater movement in a manner that would endanger others. The court found that "the land rises" from a "relatively flat area beside the river" up to the Korrow property. Witnesses at trial further testified that the Korrow parcel had not flooded in the past fifty years, despite significant storms that have caused recent flooding in the area, such as Tropical Storm Irene in 2011. One witness, who lives downstream from the project, expressly stated that the barn did not "endanger" his safety due to the project's location:

> [Attorney:] Q. Do you have any concern that there could be a flood event that would cause you concern, danger, would endanger your safety because that barn is located where it is?
>
> [Neighbor:] A. No. Absolutely not.

The court noted "the historical significance of the Korrow parcel has been that it is where residents have parked their vehicles and congregated to witness flooding events, without fear of being washed away." Additionally, a licensed professional engineer and land surveyor who visited and evaluated the project site testified that the project would not divert or restrict the flow of

14

floodwaters or "endanger the health, safety, and welfare of the public or of riparian owners, during flooding."

¶ 29. Taking the evidence in the light most favorable to the prevailing party, Korrow, the court's factual findings that project construction will not "restrict or divert the flow of flood waters" or "endanger the health, safety and welfare of the public or riparian owners during flooding" are supported by "credible evidence that a reasonable person would rely upon to support" the court's conclusions. 10 V.S.A. § 6086(a)(1)(D)(i); Zaremba Gr. Act 250 Permit, 2015 VT 88, ¶ 6; Vill. Assocs. Act 250 Land Use Permit, 2010 VT 42A, ¶ 7. Based on these factual findings, we conclude that, although the Korrow project was constructed within a "floodway," the project conforms with the requirements under Act 250 Criterion 1(D). 10 V.S.A. § 6086(a)(1)(D).

IV. Project's Compliance with Criterion 1(F)

¶ 30. For the Korrow project to remain as developed, compliance with Criterion 1(D) is not enough; if this project is within a shoreline, the project must also comply with Criterion 1(F), which regulates development within shorelines. Under 10 V.S.A. § 6086(a)(1)(F):

> A permit will be granted whenever it is demonstrated by the applicant that . . . the development . . . of shorelines must of necessity be located on a shoreline in order to fulfill the purpose of the development or subdivision, and the development . . . will, insofar as possible and reasonable in light of its purpose:
>
> (i) retain the shoreline and the waters in their natural condition;
>
> (ii) allow continued access to the waters and the recreational opportunities provided by the waters;
>
> (iii) retain or provide vegetation which will screen the development or subdivision from the waters; and
>
> (iv) stabilize the bank from erosion, as necessary, with vegetation cover.

(Emphases added.)

¶ 31. Our first task is to clarify the definition of "shoreline." Act 250 provision § 6001(17) defines "shoreline" as "the land adjacent to the waters of lakes, ponds, reservoirs, and

15

rivers. Shorelines shall include the land between the mean high water mark and the mean low water mark of such surface waters." Id. § 6001(17) (emphasis added).[4] The Legislature also authorized the NRB to adopt additional rules interpreting Act 250 provisions. Id. § 6025(b). Pursuant to this enabling language, the NRB adopted rules which provide further interpretation of "shoreline." NRB Rule 2(C)(20) specifies that "[f]or purposes of 10 V.S.A. § 6086(a)(1)(F), a project involves the 'development or subdivision of shorelines' " if: "(a) the project involves construction on or the use of 'the land between the mean high water mark and the mean low water mark of such surface waters,' "[5] or "(b) the project, or an element of the project which is <u>adjacent</u> to the shoreline, has the potential for significant impact on any of the subcriteria specified in 10 V.S.A. § 6086(a)(1)(F)(i)-(iv)." NRB Rule 2(C)(20)(a), (b) (emphasis added).

¶ 32. Under the definitions of "shoreline" provided in § 6001(17) and NRB Rule 2(C)(20), a project constructed on land "adjacent" to a river is on a "shoreline," and it will be subject to the stringent requirements of § 6086(a)(1)(F). Thus, determining whether the Korrow project is "adjacent" to the Dog and Stony Brook Rivers is essential to finding whether the project is or is not on a shoreline and whether further analysis regarding project compliance with Criterion 1(F) is necessary. With this in mind, we turn to two remaining questions: (1) whether the Korrow project is on a "shoreline" pursuant to the definitions provided in § 6001(17) and NRB Rule 2(C)(20); and (2) if so, whether the project complies with Criterion 1(F), § 6086(a)(1)(F).

---

[4] Unlike "floodway" and "floodway fringe" under § 6001(6) and (7), the ANR is not statutorily tasked with defining shorelines under § 6001(17). The parties do not dispute, and we do not consider, the level of deference the court owes to the agency construction of "shoreline."

[5] The parties do not dispute that the Korrow project is outside the scope of "land between the mean high water mark and the mean low water mark" of the Dog River and Stony Brook River—that element of both provisions is inapplicable to our analysis. 10 V.S.A. § 6001(17); NRB Rule 2(C)(2)(a).

¶ 33. Whether the Korrow project is on a "shoreline" is a finding of fact that this Court reviews for clear error. The court's determination will stand unless there is "no credible evidence that a reasonable person would rely upon to support the conclusion[]." Zaremba Group Act 250 Permit, 2015 VT 88, ¶ 6.

¶ 34. There are two flaws in the court's findings. First, although interpreting the scope of land "adjacent" to the rivers is essential to determining whether a project is on a "shoreline," no definition of "adjacent" is provided by the trial court. Second, even applying the court's contextual, rather than distance-based, analysis of the project's location in relation to the Dog and Stony Brook Rivers, the court's conclusion that the project was not on the "shoreline" is based on insufficient evidence.

¶ 35. First, the court's failure to construe the term "adjacent" leaves a hole in the analysis of the issue before us—whether the Korrow project was on a "shoreline." While this Court has not defined "adjacent" in the context of an Act 250 proceeding, the Environmental Division has evaluated this term in the context of town zoning bylaws, which restricted project development on public waters. In re Irish Constr. Application, No. 44-3-08 Vtec. (Vt. Envtl. Ct. Nov. 2, 2009), https://www.vermontjudiciary.org/sites/default/files/documents/Irish%20Construction%20Appli cation%20%20Docket%2044-3-08%20Vtec.pdf [https://perma.cc/CR7Z-794R]. In that case, the Environmental Division appears to have applied a distance-based approach to determine adjacency. The court explained that the plain meaning of "adjacent" was "close to; next to; lying near; [or] adjoining" a body of water. Id. at 5 (quotation omitted). The proposed project in Irish Construction Application was eighteen feet from the waterway at issue and was deemed "adjacent" to public water for the purposes of the zoning ordinance. Id.

¶ 36. In contrast here, the court seems to be applying a functional application of "adjacent" by looking to the project's location within the riparian buffers of the Dog and Stony Brook Rivers and evaluating the project's impact on the four Criterion 1(F) subcriteria to

17

determine whether the project is on a "shoreline." Considering the parties do not dispute the definition of "adjacent" and the court does not engage with the issue, we decline to sua sponte construe the term here. Rather, we look to the record below to support the court's finding that the project was not on a "shoreline."

¶ 37. Second, based on the record below, even applying the court's functional, rather than distance-based, application of "shoreline," there was insufficient evidence for the court to determine that the Korrow project was not on a shoreline. The court never clearly defined the scope of the shoreline; instead, the court measured the project's compliance with Criterion 1(F) based on evidence and testimony regarding the project's proximity to the riparian buffers along the Dog and Stony Brook Rivers and its compliance with the four subcriteria outlined in § 6086(a)(1)(F)(i)-(iv).

¶ 38. Riparian buffers are undeveloped, vegetated areas bordering waterways, which "are important for [protecting] adjacent waters as well as downstream reaches." The ANR recommends that permit conditions require undisturbed, naturally vegetated buffers be maintained along streams, and "the Department of Fish and Wildlife recommends maintenance of a minimum 50-foot undisturbed riparian buffer along Stony Brook . . . [and] a 100-foot minimum undisturbed riparian buffer between the development and the top of the Dog River riverbank." The Korrow project placed a small amount of fill within the Stony Brook River's 50-foot buffer during construction. Although the project's "as-built location" is "approximately 130 feet" from the Dog River, a small amount of fill was also placed within the Dog River's 100-foot buffer during construction.

¶ 39. The evidence regarding the project's location in relation to riparian buffers between the Korrow project and the rivers does not justify the court's finding that the project was not on a shoreline. To the contrary, this evidence indicates that part of the fill associated with the project was within the riparian buffers of the Dog and Stony Brook Rivers. The court appears to apply

18

the following logic: A project is on a shoreline if it is developed on land adjacent to a river; land is adjacent to a river if it is within the riparian buffer; the project here is only partially within the riparian buffer; therefore, the project is not adjacent to the river and is not on the shoreline. Even if we accept this logic and construe the term "adjacent" as synonymous with "within the riparian buffer," as the trial court seems to have done, then the undisputed fact that portions of the project were within the riparian buffers of both rivers and the impact that fact has on the "shoreline" determination are not addressed in the court's findings. Thus, the findings are insufficient to determine that the project was not on a shoreline.

¶ 40. The court further states that, even if the project was on a shoreline, it complies with the four subcriteria in § 6086(a)(1)(F)(i)-(iv) and thus meets the shoreline requirements of Act 250. However, the court fails to consider the full requirements of § 6086(a)(1)(F)(i)-(iv) by not assessing, if the project is within the shoreline, whether the project was "of necessity" located within a "shoreline."

¶ 41. Criterion 1(F) requires the Environmental Division to "make its own determination that a development need be located on the shoreline." In re McShinsky, 153 Vt. 586, 591, 572 A.2d 916, 919 (1990). NRB Rule 2(C)(21) defines "of necessity" for the purposes of 10 V.S.A. § 6086(a)(1)(F):

> [T]he project or a portion of the project must serve a water-related purpose and . . . the project's location on the shoreline serves such an integral part of the developmental scheme that the inability to locate the project, or a portion of the project, on the shoreline would make the project impossible[.]

If this project is within a "shoreline," the court must determine compliance with the "of necessity" requirement in addition to evaluating whether the project meets the four subcriteria outlined in 10 V.S.A. § 6086(a)(1)(F). The court did not do so here.

¶ 42. Considering the court's failure to adequately define the scope of the "shoreline" along the Dog and Stony Brook Rivers, the court's analysis of the project's compliance with

Criterion 1(F), even when viewed in the light most favorable to the prevailing party, is insufficient to justify its conclusions. Further, should the project fall within the "shoreline," the court must then further consider whether it must, of necessity, be located there.

¶ 43. Based on the record below, we cannot determine whether the project is constructed on a "shoreline" as defined in § 6001(17), an assessment that may or may not require ANR expertise, and, if so, whether the project complies with the subcriteria required by § 6086(a)(1)(F). As such, the Environmental Division's conclusion that the project complied with Criterion 1(F) is reversed and this issue is remanded to the court for further findings consistent with this opinion. Because the question of what is meant by "adjacent" is critical to the shoreline determination and has thus far not been briefed or argued, the parties are directed upon remand to brief this issue for the court.

We reverse the Environmental Division's ruling defining the term "floodway," but affirm its conclusion that the project complied with Criterion 1(D). We reverse and remand to the Environmental Division for further proceedings to determine whether this project involves a "shoreline" and, if so, the project's compliance with Criterion 1(F).

FOR THE COURT:

_____

Associate Justice

20