VERMONT SUPERIOR COURT
Environmental Division                                                        Docket No. 25-ENV-00073
32 Cherry St, 2nd Floor, Suite 303,
Burlington, VT  05401
802-951-1740
www.vermontjudiciary.org



| Putney Rowing Club Inc. Land Use Permit Application |
| --- |

## MERITS DECISION

This is an appeal by Putney Rowing Club, Inc. (Appellant), of an August 18, 2025 decision of the District #2 Environmental Commission (District Commission) approving, pursuant to 10 V.S.A. §§ 6001-6011, Appellant's Act 250 permit amendment application to install a seasonal dock and footpath on the Connecticut River, but denying its further request to clear portions of the site and construct a 38' x 100' boathouse building with associated driveway and parking areas (collectively, the Project).  Specifically, the District Commission concluded that aspects of the Project, namely the boat house, driveway and parking areas, did not comply with Act 250 Criteria 1, 1(E) and 1(F).  Appellant timely appealed that decision to this Court; it challenges the denial of its request to construct the boathouse, driveway, and parking area, as well as the site clearing necessary for the project's purpose. This Court conducted a merits hearing on October 7, 2025 via the Webex platform.  During the merits hearing, the Appellant was represented by Hans Huessy, Esq.  The Land Use Review Board was represented by Jenny Ronis, Esq., and the Vermont Agency of Natural Resources was represented by Kane Smart, Esq., and Charles Peel, Esq.

With respect to this Merits Decision, the parties have submitted a set of stipulated facts largely drawn from the District Commission's decision.  The Court commends the parties for reaching a stipulation that allows the efficient adjudication of the matter.  Further, the Court has reviewed the stipulation and concludes that the stipulated-to facts are adequately supported.  As such, the Court adopts the party's stipulated facts herein.  Although the Court has incorporated the parties' facts into this decision in a different order than they were submitted to this Court, the facts themselves are restated verbatim.[1]

---

[1] The parties' stipulated facts have been marked with an asterisk at the end of the sentence.

## Findings of Fact

1. Appellant owns a long, narrow tract of land, consisting of 5.13 acres, located along and immediately adjacent to the Connecticut River in Dummerston, Vermont (Property).

2. Prior to Appellant's purchase of the Property in 2020, it had been developed with an A-frame dwelling, wastewater system and parking area. Access to the dwelling was via Dummerston Station Road, which terminates at or near the site. A gravel driveway passes under the railroad tracks to reach the dwelling.

3. At the time that Appellant purchased the Property it was covered by a substantial amount of junk and debris, including trash, junk vehicles, batteries and liquid in steel drums. Appellant has worked to clean up and remove these materials from the Property.

4. In 2023, Appellant submitted Act 250 application #2W0317-6 to the District Commission to authorize the construction of a 38' x 100' boathouse building with a driveway and parking lot (with related site clearing) and seasonal installation of a dock on the Connecticut River.

5. The application was deemed complete April 5, 2023, and the District Commission held a hearing on the matter on June 15, 2023.

6. On February 4, 2025, the District Commission issued Land Use Permit 2W0317-6 (the Permit). The District Commission found, however, that only the seasonal dock and footpath complied with all Act 250 criteria, and that construction of the building, driveway, parking, and site clearing did not comply. Appellant timely appealed that decision to the Environmental Division. The application was subsequently remanded by stipulation so that the District Commission could correct deficiencies in the Permit's factual findings.

7. On August 19, 2025, the District Commission re-issued the Permit (2W0317-6 (Remanded)), which, in addition to authorizing construction of the seasonal dock and footpath, expressly denied the portion of the application concerning construction of the boathouse and related driveway and parking facilities. Appellant again timely appealed the matter to this Court.

8. The project site on Appellant's parcel is located on one of two large plateaus of land running parallel to the Connecticut River. One plateau, the more easterly of the two, is immediately adjacent to the riverbank and rises from/falls steeply to the water. This is the plateau on which the Project is located. The other plateau, located to the west, is created from the elevated railroad tracks that run behind the project. Further to the west of the proposed project (and the railroad tracks) lies approximately 16 acres of farmland.

9.     A single 20-inch culvert (beneath the railroad line adjacent to the river) effectively serves as the primary drainage location during storm events for an area of approximately a quarter mile surrounding the Property. The westerly plateau created by the railroad line effectively serves as a dam and funnels stormwater and runoff from the 16 acres of farmland through the culvert.

10.     The culvert is located directly uphill of the proposed boathouse and has carved large gullies out of the riverbank over the passage of time due to highly concentrated, long-duration flows of water.

11.     The entire property is located within the 100-foot riparian buffer of the Connecticut River. * Parties' Stipulated Facts.

12.     The Connecticut River and the railroad tracks "bookend" the relevant tract of land (and those around it in this area), such that available, developable river-side property is generally scarce and development outside of the river's riparian buffer, for boathouse purposes, is extremely difficult because the railroad blocks access.

13.     The original site plan for the project was circulated to the Agency of Natural Resources (ANR), which requested certain modifications. All of ANR's requested changes and modifications were addressed to its satisfaction by Appellant prior to production of the final version of the site plan submitted to the Court at the merits hearing.

14.     ANR reviews Act 250 applications for their conformance with the Agency's Guidance for Agency Act 250 and Section 248 Comments Regarding Riparian Buffers ("Buffer Guidance"). Undisturbed, naturally vegetated riparian zones (i.e., riparian buffers) are important for providing many ecological functions as well as maintaining the natural condition of the stream. * Id.

15. Before the Commission hearing, ANR submitted the following comment [by] letter:

   a.  As a standard approach, the Agency typically requests a 100-foot, undisturbed riparian buffer for new projects, however the buffer guidance also provides the Agency with discretion for review and approval of riparian management plans. The Putney Rowing Club's application presents factors that warrant consideration of a riparian management plan in this case, based on the site constraints (a significant portion of the long narrow parcel immediately adjacent to the river and located within the riparian buffer area); the project purpose (boat house); and the fact that commencement of construction has already begun (site clearing with removal of mature trees and construction on the foundation of the boat house) necessitating additional mitigation.* Id.

16.     ANR requested that the following conditions be included if the Court were to issue a land use permit for the Project:

a. The Project tract is located within 100 feet of the top of the slope of the Connecticut River. Except for Project activities authorized by this permit, and which are shown and described in Exhibits 8 and 10 (Site plan, planting plan and monitoring plan), the Permittee shall maintain an undisturbed, naturally vegetated riparian zone on the Project Tract which shall begin at the water's edge at base flow conditions, and shall extend to the western property boundary as depicted on the site plan, Sheet C-1, Exhibit 10. The term "undisturbed" means that there shall be no activities that may cause or contribute to ground or vegetation disturbance or soil compaction, including but not limited to construction; earth-moving activities; storage of materials; tree trimming or canopy removal; tree, shrub, or groundcover removal; plowing or disposal of snow; grazing; or mowing. *

b. Permittee shall implement the planting plan dated March 1, 2024, revised April 24, 2024 (Exhibit 8) and the Site Monitoring Plan (Exhibit 8). Riparian zone plantings shall be completed within one growing season following Project construction. During each growing season for five years after planting, the Permittee shall monitor the proposed mitigation and enhancement areas to ensure 75% survival of planted species and shall replace failed plantings. A report shall be submitted to the District Commission and Agency by November 30 each monitoring year identifying results, survival shortfalls, and remediation plans if necessary. * Parties' Stipulated Facts.

17. The Appellant submitted a planting plan. * Exhibit 8.

18. The Appellant applied for and received Authorization to Conduct Stream Alteration Activities, permit number SR-2665, for the "[r]iverbank slope grading for access to the river" on May 12, 2021. * Id.

19. Appellant, through its Club President, stipulated that it will comply with ANR's conditions a. and b., above.

20. The project plan proposes to address impacts from both on-site and off-site stormwater. On-site stormwater is water that accumulates directly in the project area from precipitation, snowmelt and similar circumstances. Off-site stormwater is water that accumulated elsewhere (such as the adjacent farmland) and flows from the point of accumulation across the project area.

21. The stormwater system (including, without limitation, the catch basin, overflow structure, 36" HDPE pipe, swale, berm and rip-rap with filter fabric shown on the submitted site plan details) is primarily intended to mitigate and reduce impacts from off-site stormwater, while the French drains

(which utilize perforated PVC pipe in a stone-filled trench), plantings and vegetation (shown on the site plan and the planting plan) are intended to mitigate and reduce impacts from on-site stormwater, including from the gable roof of the boathouse.

22. The stormwater system will also mitigate and reduce the erosive effects of the culvert's channelization by intercepting the stormwater before it can flow across the Property, discharging stormwater flows in a manner that dissipates the erosive energy of the water.

23. The plantings are intended to stabilize the ground to reduce further erosion. The plantings alone, however, would not suffice to stop further erosion of the riverbanks without the inclusion of the stormwater system.

24. The Project will result in approximately 3,800 square feet of new impervious surfaces (the boathouse roof) and 0.4 acres of anticipated disturbance on the property, to be located entirely within the 100-foot riparian buffer. * Id.

25. Although construction of the boathouse will increase the total amount of impervious surface in the project area, that increase will not result in additional erosion, runoff of sediments, or runoff of other pollutants into the river.

26. Runoff from the boathouse's gable roof will be captured by the French drains, and the sandy soil present in the area should absorb any additional on-site stormwater.

27. Appellant intends to construct the driveway and parking area for their project on land that had previously been used for that purpose. As a result, any soil compaction from vehicles has already occurred, and the construction of those features will not result in additional soil compaction.

28. Appellant intends to use an existing gully for the path to the river following work to stabilize the banks of the gully. The intent of the project is, in part, to provide access to the river by members of the public.

29. The dock will be removed seasonally. * Id.

30. The dock will be located adjacent to one of the large gullies and the Appellant will access it via an already cut slope.

31. Only the seasonal dock and footpath will be visible on the shoreline of the Connecticut River. By using existing vegetation and adding plantings of species native to the area, Appellant will screen the other features of the project from view.

32. The project will maintain the shoreline in its natural state to the extent possible, including by retaining vegetation.

33.    The plantings, together with the stormwater system, will serve to stabilize the riverbank, mitigate the potential for future erosion, and begin the process of rehabilitating sections of the bank that have already eroded.

34.    At present, Appellant must deconstruct its boathouse and remove all boats annually. Removal of the boats also occurs during flooding events, which has happened on multiple occasions over the past few years.

35.    The Appellant's boats are long, heavy, and cumbersome—they can be up to 45 feet long and weigh up to 150 pounds. They usually require multiple people to carry, sometimes as many as six to carry a "quad" boat. Bringing the oars for the boats down to the river requires a second trip.

36.    Many of Appellant's members are elderly. Carrying the boats any distance to the river—even half a mile—would be difficult for this reason, but also because the boats are handmade out of wood, fragile and susceptible to damage.

37.    No reduction in the planned length of the boathouse could occur without impacting Appellant's ability to move the boats in and out of the structure. Similarly, no reduction in the width of the boathouse could occur without increased danger of striking one boat with another during transport.

## Discussion

### I.    Criterion 1: Water Pollution

10 V.S.A. § 6086(a)(1) provides:

> (a) Before granting a permit, the District Commission shall find that the subdivision or development:
>
> (1) Will not result in undue water or air pollution. In making this determination it shall at least consider: the elevation of land above sea level; and in relation to the flood plains, the nature of soils and subsoils and their ability to adequately support waste disposal; the slope of the land and its effect on effluents; the availability of streams for disposal of effluents; and the applicable Health and Environmental Conservation Department regulations.

10 V.S.A. §6086(a)(1).

Criterion 1 prohibits granting applications for proposed projects that will cause "undue water or air pollution." Id. "[W]hether 'undue' pollution will result from a proposed project is a highly fact-specific inquiry that depends on a wide variety of factors, only one of which is compliance with applicable regulations." In re Diverging Diamond Interchange SW Permit, 2019 VT 57, ¶ 44. There is no universally accepted definition of what constitutes undue pollution, but a commonly accepted

definition is "that which is more than necessary—exceeding what is appropriate or normal." Id; In re Diverging Diamond Interchange A250, No. 169-12-16 Vtec, slip op. at 13 (Vt. Super. Env. Div. Apr. 16, 2020) (Walsh, J.). The sub-factors listed in Criterion 1 are relevant to the Environmental Division's considerations of whether a project will result in undue pollution, but the Court may permissibly consider "any factors relevant to a determination of whether a proposed project will cause undue pollution." Diverging Diamond Interchange, 2019 VT 57, ¶ 45 (citing In re Hawk Mtn. Corp., 149 Vt. 179, 184). Whether an applicant plans to take steps to mitigate any proposed discharges from the project may factor into the undue water pollution analysis. Diverging Diamond Interchange A250, No. 169-12-16 Vtec, slip op. at 14 (Apr. 16, 2020) (Walsh, J)..

Appellant's proposed project complies with Criterion 1. While the project will result in approximately 3,800 square feet of new impervious surface within the riparian buffer, the effect would be mitigated by the presence of the stormwater system and French drains that Appellant plans to install on the Property. Appellant sited these features with due consideration for the nature of the soils in the area and their ability to support waste disposal in relation to flood plains.[2] Appellant intends — and has taken reasonable steps to ensure — that runoff from the boathouse roof will be captured by both stormwater features, and that the sandy soils present in the project area will absorb any additional runoff such that the project will not result in additional runoff, runoff of sediments, or runoff of other pollutants into the water. Appellant has also taken into consideration both the land's elevation and the slope of the land and its effect on effluents. While the stormwater system serves several purposes in Appellant's project, one of its primary functions is to divert the flow of off-site stormwater across the property from neighboring (elevated) farmland.[3]

The final piece of Criterion 1 requires consideration of applicable Health and Environmental Conservation Department regulations set by the Agency of Natural Resources (ANR). ANR has been an active participant throughout the permitting process for this project and requested two specific conditions be added to Appellant's permit, should the permit be granted. Condition "a" requires maintaining vegetation in the riparian zone and an "undisturbed" shoreline, which in part forbids

---

[2] Although it was not noted explicitly at the hearing, the Court assumes (based on the location and topography of the parcel) that at least a portion of the property lies in the flood plain. As such, we include analysis of these subfactors of Criterion 1 for completeness.

[3] Additionally, the Court understands Appellant and members have removed trash/debris, batteries, junk vehicles, and miscellaneous liquid-filled barrels from the property in making improvements in preparation for the project. Exhibit 2. Although this is not a required element of the Act 250 Criteria at issue in this appeal, the waste removed clearly had the potential to result in serious pollution, particularly given its proximity to the river. The Court appreciates members' diligence and commitment to maintaining the condition of the area and mitigating potential negative environmental impacts from the waste materials previously located on site.

activities that contribute to vegetation disturbance and soil compaction. Condition "b" mandates implementation of the planting plan submitted by Appellant and sets parameters for gauging its success. Appellant has stipulated that it would abide by the Agency's conditions. Additionally, Appellant has located the planned parking area and driveway in the same area already used by vehicles to avoid additional soil compaction on an alternative portion of the Property. Appellant also intends to conduct extensive plantings to help reduce erosion and stabilize the riverbanks. At the conclusion of trial, all parties agreed that ANR's concerns were addressed through these activities and conditions. Finally, Appellant has applied for and received a stream alteration permit from ANR for grading the riverbank slope. For all these reasons, the project complies with Criterion 1.

## II. Criteria 1(E) (Streams) & 1(F) (Shorelines)

### A. Criterion 1(E)

Criterion 1(E) requires that "the development or subdivision of lands on or adjacent to the banks of a stream will, whenever feasible, maintain the natural condition of the stream, and will not endanger the health, safety, or welfare of the public or of adjoining landowners." 10 V.S.A. § 6086(a)(1)(E). The burden of proof is on the Applicant under Criterion 1(E). 10 V.S.A. § 6088(a); Re: Times & Seasons, LLC et al, #3W0839-2-EB (Altered), Findings of Fact, Conclusions of Law, and Order at 35 (Vt. Envtl. Bd. Nov. 4, 2005).

In this case, Appellant has taken a number of steps to maintain the natural condition of the stream, and the project will not pose any danger to the health, safety, or welfare of the public or adjoining landowners.[4] Appellant will stabilize the banks of the river and construct an armored rip rap apron as part of its stormwater management system that will help to dissipate the erosive energy of off-site stormwater flowing across the property towards the river. Appellant will install extensive plantings of species native to the area to work in concert with the stormwater system to stabilize the banks of the river, and conduct additional stabilization work on a gully created by erosion from the existing culvert in the area, as shown on Exhibits 8 and 10. The plantings will also work to screen the project from view, helping to preserve the river's natural appearance and condition. The gully will be

---

[4] It is highly likely that the natural condition of the Connecticut River in this area had already been altered by the construction of the railroad, as evidence by the culvert and resulting gullies carved out from long periods of concentrated erosive flow. Taking that information as the background condition of the project site, the Court interprets the requirement to "maintain the natural condition of the stream" to mean no further significant alterations to the condition of the stream, as it now exists, occur. Despite this, the planned remediation work Appellant will conduct in connection with this project, such as planting and stabilization on the banks and gully, will likely begin the process of restoring those areas, bringing the river closer to its natural condition than it would have otherwise been.

used as the primary access to the river from the project site, obviating the need to further alter the river's natural condition by creating a separate pathway. Further, as set forth below, the project will maintain the shoreline in its natural condition to the extent possible. Because only the dock and footpath will be visible on the shoreline, and Appellant's dock will be removed seasonally, this impact will be minimal.

There is no evidence before the Court to suggest that this project could pose a danger to the health, safety or welfare of the public or adjoining landowners. The project will not create any discharges that could independently contribute to the degradation of water quality and indirectly pose a danger in that way. Presently, discharges originating in other (off-site) locations flow through the proposed project area (such as from the adjacent farm) via the existing culvert, down the path of least resistance evidenced by the existing gully, and directly into the river. Construction of the project means this off-site stormwater will pass through the boathouse's stormwater system, where it will be slowed down and filtered through the filter fabric in the rip-rap apron. Exhibit 10. Thus, it may well be the case that implementation of the project improves the quality of existing discharges into the river. Additionally, the removable dock could be taken out of the river with proper warning, limiting the danger of possible hazards during extreme flooding events.

For these reasons, the Court finds the project will maintain the shoreline in its natural condition and will not endanger the health, safety, or welfare of the public or adjoining landowners. Thus, the project complies with Criterion 1(E).

**B.** Criterion 1(F)

Criterion 1(F) concerns shorelines. 10 V.S.A. § 6086(a)(1)(F) mandates:

> A permit will be granted whenever it is demonstrated by the Applicant that, in addition to all other criteria, the development or subdivision of shorelines must of necessity be located on a shoreline in order to fulfill the purpose of the development or subdivision, and the development or subdivision will, insofar as possible and reasonable in light of its purpose:
>
> (i) retain the shoreline and the waters in their natural condition;
>
> (ii) allow continued access to the waters and the recreational opportunities provided by the waters;
>
> (iii) retain or provide vegetation which will screen the development or subdivision from the waters; and

(iv) stabilize the bank from erosion, as necessary, with vegetation cover.

10 V.S.A. § 6086(a)(1)(F).

The first step of this analysis is to determine whether the project must of necessity be located on the shoreline. Act 250 Rule 21 defines "of necessity" to mean:

> [T]hat the project or a portion of the project must serve a water-related purpose and that the project's location on the shoreline serves as such an integral part of the developmental scheme that the inability to locate the project, or a portion of the project, on the shoreline would make the project impossible.

Act 250 Rules, Rule 2(C)(21). The Applicant bears the burden of proving compliance with Criterion 1(F). 10 V.S.A. § 6088(a); In re Korrow Real Estate, LLC Act 250 Permit Amendment Application, 2018 VT 39, ¶4.

The Appellant in this case has shown that the project serves a water-related purpose and that the project's location on the shoreline serves as an integral part of the developmental scheme. The primary purpose of the boathouse will be to store the boats Appellant regularly uses during the spring, summer, and fall for rowing on the Connecticut River. This is a water-related purpose, justifying a conclusion that the project must "of necessity" be located along the shoreline. W. River Acres, Inc. et. al., #2W1053-EB, Findings of Fact, Conclusions, and Order (Vt. Envtl. Bd. July 16, 2004) (Environmental Board finds planned swimming and canoeing access areas to be "of necessity" located on a shoreline because they are "water-dependent activities"; horse carriage training area is not water-dependent and thus not required to be located on the shoreline). Rowing is a water-dependent activity. A rowing boathouse thus serves a water-related purpose, and the project meets this prong of the analysis.

To meet the second prong of the "of necessity" analysis, there must be a finding that the project's location on the shoreline serves as an integral part of the developmental scheme. Appellant's entire parcel lies within the 100-foot riparian buffer of the Connecticut River. Further, the topography of the land creates natural barriers in the form of plateaus that bookend the property—one formed by the raised railroad tracks, another formed by a gradient on the side near the boathouse and steep drop-off to the river on the other side. Further, the

boathouse cannot be constructed any shorter or more narrowly than currently designed without increased danger of damaging the boats during storage and transport.[5]

Due to the parcel's unique location and topography, construction of the boathouse at the requisite dimensions anywhere on the parcel necessarily triggers the protections of Criterion 1(F). Put another way, there is no location on the property where the boathouse could be sited outside the 100-foot riparian buffer. The boathouse has been specifically designed to meet the needs of the overall project and the boats it will house. To make the boathouse smaller would materially impede the primary purpose of the project, which is a permanent structure for boat storage that does not require seasonal removal of the boats and can withstand periodic flooding. As such, the Court finds the boathouse to be an integral aspect of the overall project's developmental scheme, and that it meets the second prong of the "of necessity" test.[6]

Finally, while not directly relevant to the standard, it is worth noting that, were the boathouse not constructed in its planned location, there would be no need for the installation of the stormwater system and French drains to mitigate the effects of the additional impervious surface created by the roof and prevent further erosion in the project area. These aspects of the project have already been found beneficial to the environment and natural condition of the river in the area.

The Court next turns to the subcriteria of Criterion 1(F).

       i.       Retention of shoreline and waters in their natural condition

---

[5] Although this Court has jurisdiction to review all aspects of the project *de novo*, including the seasonal dock and footpath, no party disputed that both of those features complied with all Act 250 criteria. We decline to disturb the District Commission's finding(s) in that regard and, thus, focus on the boathouse in our analysis.

[6] The project at issue here can easily be distinguished from previously denied projects like the one in Woodford Packers, Inc. In that case, the Environmental Board found that a walking path for a retirement home on the shoreline of a river did not satisfy the "developmental scheme" prong of the "of necessity" test and was affirmed by the Supreme Court. Woodford Packers, Inc., #8B0542-EB, Findings of Fact, Conclusions of Law, and Order, p. 26; In re Woodford Packers, Inc., 2003 VT 60, ¶ 20. Specifically regarding the walking path, the Board found:

> The site plan for the Project includes, not only the walking path, but a community center, shuffleboard court, and lawn for lawn bowling and croquet. There is no reason to believe that the statute's requirement for "significant facilities and services" cannot be met by these other proposed recreational and social facilities.

Woodford Packers, Inc., #8B0542-EB, p. 26.

Unlike the project in Woodford Packers, this project directly serves a water-related purpose. Moreover, other aspects of the Woodford Packers project could accomplish the end goal of recreational uses for residents; here, inability to construct the boathouse would frustrate one of the project's primary purposes (permanent storage for fragile boats) and could not be replaced by some other aspect of the project.

Appellant's project will retain the shoreline and waters in their natural condition, as covered in greater detail in the discussion of Criterion 1(E), above. Appellant will: 1) stabilize the banks of the river with plantings; 2) control on- and off-site stormwater using French drains and a stormwater system to minimize effluents and sediment entering the river; 3) put measures in place to prevent further erosion of existing gullies and utilize a gully as a pathway; 4) screen the project from view; and 5) seasonally remove the dock. Thus, Appellant has met the requirements of subcriteria (i).

### ii. Continued access to the waters and the recreational opportunities provided by the waters

The project's main intention, in part, is to provide access to the river for members of the public. Further, completion of the project would not change the current access or recreational opportunities provided by the Connecticut River. Thus, this element of Criterion 1(F) is met. W. River Acres, Inc. et. al., #2W1053-EB, Findings, Conclusions, and Order slip op. at 15 (Vt. Envtl. Bd. July 16, 2004).

### iii. Retention or provision of vegetation which will screen the development or subdivision from the waters

Appellant has met this element of Criterion 1(F). A significant element of Appellant's plan to mitigate erosion involves stabilizing the banks of the river by using existing vegetation and planting additional native vegetation selected in conformity with ANR standards. Exhibit 8. These plantings will screen the project from view and only the dock and footpath will be visible from the river. Further, the dock will be removed seasonally, meaning it will only be visible for a portion of the year. For these reasons, Appellant has met this element of Criterion 1(F).

### iv. Stabilization of the bank from erosion, as necessary, with vegetation cover

Based on discussions of Appellant's compliance with Criterion 1(E) and 1(F)(iii) above, this element of 1(F) has been met.

### Conclusion

For all the above reasons, the Court concludes that Appellant's project satisfies Criteria 1, 1(E), and 1(F). A Judgment Order accompanies this decision.

Electronically signed on November 21, 2025, pursuant to V.R.E.F. 9(d).

Joseph S. McLean
Superior Court Judge
Environmental Division